[Cite as *State v. Howard*, 2023-Ohio-3870.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 112024 |
| v. | : | |
| VINCENT HOWARD, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 26, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652446-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel Cleary, Assistant Prosecuting Attorney, *for appellee.*

Charles A. Koenig, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} Vincent Howard ("Howard") appeals his convictions of three counts of forcible rape in violation of R.C. 2907.02(A)(2), which are first-degree felonies, and one count of gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(1),

which is a fourth-degree felony. After reviewing the facts of the case and pertinent law, we affirm Howard's convictions.

## I. Facts and Procedural History

{¶ 2} On February 2, 2020, 19-year-old C.S. spent the night at Howard's house. Howard, who was 49 years old at the time, had been a father figure to C.S. for most of her life. C.S. and Howard engaged in sexual conduct, and the crux of this case concerns whether this sexual conduct was consensual.

{¶ 3} On August 17, 2020, Howard was charged with eight counts related to the alleged sexual assault of C.S. This case was tried to a jury, and on August 19, 2022, Howard was found guilty of three counts of forcible rape and one count of GSI. On September 15, 2022, the court sentenced Howard to an aggregate prison term of 15-17.5 years.

{¶ 4} Howard now appeals raising three assignments of error for our review:

> I. The trial court abused its discretion by denying defense motions for a continuance of the trial, thereby denying appellant a meaningful opportunity to present a complete defense which denied him effective assistance of counsel in violation of his rights under the due process clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I, of the Ohio Constitution.
>
> II. Appellant was deprived of his constitutional rights to due process in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, as a consequence of the state's prosecutorial misconduct.
>
> III. Appellant's convictions were not supported by sufficient evidence and were against the manifest weight of the evidence in violation of his rights under the due process clauses of the Fifth and Fourteenth

Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

## II. Trial Testimony and Evidence

{¶ 5} The state presented three witnesses: nurse Denise Robinson, C.S., and police officer Berri Cramer. Howard testified in his own defense.

### A. Denise Robinson

{¶ 6} Denise Robinson ("Robinson") testified that she is the forensic program coordinator for University Hospitals and "primarily works with patients who have been victims of sexual assault, domestic violence, or victims of crimes." Robinson is also a SANE nurse, which means she is a certified sexual-assault nurse examiner who performs rape kits on sexual-assault victims. Robinson was working on February 3, 2020, and she treated C.S. as well as filled out C.S.'s sexual-assault forensic report (the "rape-kit report"). The state introduced this rape-kit report into evidence.

{¶ 7} According to Robinson, C.S. was 19 years old at the time Robinson treated her. C.S. named Howard as the person who sexually assaulted her. C.S. described Howard as her "Godfather." Robinson collected swabs from "dried stains" on C.S.'s head, breast, thighs, back, and hands because, according to C.S.'s "story[,] those are the areas that she mentioned that may have been touched. So those are the areas that I would swab." Robinson further testified about direct questions that she asked C.S., such as, "Did the finger touch or penetrate your vaginal, anal, or oral areas?" Robinson testified that C.S. answered "yes to vaginal."

{¶ 8} Robinson testified that, although C.S.'s narrative in the rape-kit report does not "really mention" digital penetration, Robinson "documented what [C.S.] told me in the narrative" by writing the word "yes" on the report in answer to the question, "Did finger touch or penetrate" C.S.'s vagina. To clarify, the prosecutor asked Robinson the following question: "But earlier [C.S.] did say that [Howard's] finger did go in there, but when she told you the whole story the finger wasn't mentioned, correct?" Robinson answered, "Yes, yes."

{¶ 9} Robinson testified that C.S. stated to her as follows during the examination: "He gave me oral. He tried to make me get on top of him when he was giving me oral. My legs were shaking. My heart was beating real fast. He asked why I was shaking." According to Robinson, C.S. was "[s]oft-spoken [and] tearful throughout" the examination, and C.S. told Robinson that she felt sick.

**B. C.S.**

{¶ 10} C.S. testified that she has known Howard since she was four years old when he was dating C.S.'s mother. C.S.'s mother passed away when C.S. was seven years old, but Howard remained in C.S.'s life. C.S. referred to Howard as her godfather, testifying that "he stepped up and fulfilled the role of father in my life." C.S. resided primarily with her grandmother, although she spent most weekends while she was growing up with Howard and his children.

{¶ 11} On February 2, 2020, at approximately 6:00 p.m., C.S. arrived to work at an Amazon fulfillment center. C.S. had a taser in her work bag, and when she entered the facility, her taser set off the metal detector. C.S. was sent home from

work that evening. C.S. was upset, and she called her grandmother, then called Howard. C.S.'s grandmother and Howard agreed that C.S. needed to be patient, and she would be back at work in a few days. C.S. testified that Howard said to her, "[I]t's the Super Bowl, the game is on, you want to order a pizza and watch the game." C.S. then went to Howard's house in Garfield Heights.

{¶ 12} When C.S. arrived at Howard's house, he was home alone, and he had the television on in his bedroom. C.S. and Howard went into his bedroom to watch the Super Bowl. C.S. sat "[o]n the bed. In the corner toward the wall on the edge of the bed." C.S. testified as follows about what happened next:

> After that he comes into the room and he sits at the head of the bed. And I was talking to him, looking at the game, not really paying attention to what was taking place, just trying to distract myself somewhat. And he said I still looked sad and to come up to the head of the bed so he could hold me. And he haven't held me like that since I was a kid. * * * And he told me with his arms out, as a hug, to come in like a father.

{¶ 13} C.S. went to Howard and laid her head on his chest. Howard called C.S. his "little baby." Howard continued to watch the Super Bowl, and C.S. fell asleep still "laying" on Howard. At some point later, C.S. woke up to Howard "caressing" her arm and leg. C.S.'s testimony continued: "When I woke up, my sports bra and my shirt being lifted and all — the game was off and the lights were off and the door was closed. * * * My shirt was being lifted and my sports bra and I was on my back." According to C.S., Howard's hands were on her breasts. C.S. testified that she "[f]elt like a dead body. Like I felt like I couldn't move. I felt like I got stuck — just felt stuck. I just felt real heavy and stuck. Just like my body was just paralyzed."

{¶ 14} According to C.S., Howard was on top of her. "His hands were on my breasts and he was making his way down towards my pants to pull them down. * * * He was like on his like knees. He was laying down. As I was laying on my back, he was maybe like laying over me. So as he was pulling my shirt up * * * he was making his way down to pull my pants like down my body is what I am trying to tell y'all."

{¶ 15} C.S. testified that when she first woke up, Howard's head "was like on my breast. He was playing with my breasts, licking my breasts." Howard took C.S.'s pants and underwear off. C.S. did not tell Howard no, and she did not "try to fight him off." Asked why, C.S. testified as follows:

> I was just preparing myself for what was about to happen because I was feeling around for my phone and my keys, where they was at before I fell asleep. And I couldn't feel them nowhere. So I was just preparing myself for what I knew — I knew what was about to happen, thought was about to happened because the door was closed and my phone and my keys was moved from the side of me and the bedroom door was closed and all the lights was off. And he was on top of me. So I was telling myself like no fighting this because of the size. And I knew I can't make a run for it because the door is closed and I can't call nobody because my phone and stuff was moved from the side of me. So I just was bracing myself for the fact that he going to rape me and then kill me right afterwards. That's all I kept trying to prepare myself for. I just kept telling myself over and over.

{¶ 16} Asked if she cried, C.S. answered, "Yeah. I cried the whole time. I opened my eyes to realize it wasn't a dream."

{¶ 17} C.S. testified that Howard did not say anything until he pulled her pants down. "When he pulled my pants down, he performed oral on me and was pleasuring hisself and that's when he started talking and saying he was so sorry."

Asked if Howard put his mouth on her vagina, C.S. answered, "Yes." C.S.'s testimony continued:

> Q: While he's down there using his mouth on your vagina, where are his hands? What are his hands doing?
>
> A: Pleasuring hisself. He was masturbating.
>
> Q: Are either of his hands touching your vagina that you know of? Was anything going inside of your vagina outside of his tongue at that point?
>
> A: I don't remember. He just performed oral and was pleasuring himself. I don't remember.

{¶ 18} According to C.S, Howard "came back up to the head of the bed and wrapped his arms around" her. Howard again told C.S. that he was sorry, and she was "too pretty for [her] own good." C.S. testified that she was crying "[t]he whole time." C.S. testified about what happened next:

> He kept trying to force his tongue into my mouth, was like kissing me. I just kept my mouth shut, kept my lips shut, was crying. And then he asked me like do you want me to continue. And I still was just crying. I gave him no answer. And he said I'm going to just keep going. He turned me on my — he turned me on my stomach and * * * [s]aid I'm going to just continue.
>
> * * *
>
> So when he turned me on my stomach that's when he — put his thing inside of me. * * * I was on my stomach and he put his penis inside of my vagina.

{¶ 19} Asked how long this lasted, C.S. answered, "It seemed like forever. I don't know how long it lasted." Asked if Howard ejaculated, C.S. testified that she did not know. Asked how she knew that it was Howard's penis that penetrated her vagina, C.S. answered, "Because he was moving his hands to be able to put it in."

Howard asked C.S. if she "liked it," and C.S. said "no" while she was crying into the pillow. At that time, Howard "got off of" C.S., who "ran to the corner of the room" looking for her pants, phone, and keys. Howard told her to "close [her] eyes so he could turn the light on." Howard then handed C.S. her keys and phone.

{¶ 20} C.S. got dressed and started to walk out of the door. Howard told C.S. that she forgot her shoes. C.S. grabbed her shoes and left the house. C.S. recalled that Howard "was just standing there" dressed in a "wife beater" and boxer shorts. C.S. testified that her "body just felt heavy" and she "walked like a zombie to the car." C.S. also recalled that, although her truck was still parked in Howard's driveway, it was "turned around" and was facing the opposite direction "from where [she] had parked it at." According to C.S., "somebody" moved her truck. C.S. got in her truck and went to her grandmother's house. Along the way, C.S. stopped at a light on Miles Road to throw up. C.S. told her grandmother what happened, and her grandmother took her to the hospital.

{¶ 21} According to C.S., the police came to the hospital to talk to her that day, and she met with a detective about a week later at her grandmother's house. At the detective's directive, C.S. called Howard on February 10, 2020, and this call was recorded. C.S. testified that she and the detective did not discuss what C.S. "would say on that call" before C.S. made the call. According to C.S., her conversation with Howard was "authentic."

{¶ 22} A recording of this phone call was introduced into evidence and played for the jury. The following is relevant to the instant appeal.

{¶ 23} Howard asked C.S. where she was. C.S., who was audibly sobbing during this phone conversation, responded. Howard then said to C.S., "I am so sorry." Howard asked C.S. to come over and talk about what happened. C.S. said, "I'm not coming over." C.S. told Howard that she "need[ed] to understand" what occurred that night. Howard said, "I, I, I, I, got confused and thought you were somebody different. I thought you were this girl with a 'black and mild' smell * * * that I was dating, Shonniece." Howard further stated, "I, I, I that's no excuse. I don't know why that was in my head or anything. * * * I would never, I should never. I don't even know what to say or do. I should never have done that to you."

{¶ 24} C.S. stated to Howard, "You really raped me. * * * I can't sleep." Howard said nothing. C.S. explained in excruciating detail the effect that Howard's actions had on her, including wetting the bed and throwing up in her sleep. Howard said, "You know I would never * * * want to hurt you. I don't have anything I can do to explain or excuse myself."

{¶ 25} After the audio recording was played, the prosecutor asked C.S. if she consented "to any of this." C.S. answered, "No." The prosecutor then asked C.S. the following question: "Had another man done this to you, who would you have called?" C.S. answered, "Vince. I would have called Vincent Howard if another man would have done this to me."

## C. Berri Cramer

{¶ 26} Berri Cramer ("Off. Cramer") testified that she is a patrol officer with the Garfield Heights Police Department. On February 3, 2020, Off. Cramer met with

C.S. at Ahuja Medical Center "for a possible rape report." After speaking with C.S., Off. Cramer learned that Howard was the suspect of C.S.'s allegations.

**D. Howard**

{¶ 27} Howard testified that he met C.S. in 2005 when he began dating C.S.'s mother. At the time, C.S. was four years old. Asked what his relationship with C.S. was, Howard testified that it "[w]as sort of a friendship, kinship to a fatherly role." C.S.'s mother passed away in 2007 when C.S. was six years old. C.S. was raised by her maternal grandparents, but Howard and his children maintained their relationship with C.S.

{¶ 28} On February 2, 2020, Howard was "home in bed, sick * * *. Fever, headache." According to Howard, he had plans to watch the Super Bowl that night with his son, but Howard was "too sick to go into the living room and hang out with him," so Howard's son went out. Howard drank "a cup and a half" of a Jack Daniel's "hot toddy." In the early evening, C.S. called Howard with "a problem at work where they wouldn't let her go in because of [a] stun gun, so she was upset that she couldn't work." Howard told C.S. that he "could just order her some pizza" and they "could talk about it, like [they] always have."

{¶ 29} C.S. arrived at Howard's house approximately 30 minutes later. Shortly after C.S. arrived, the pizza was delivered. Howard "grabbed a couple slices and headed towards the bedroom." C.S. also got pizza and took it into Howard's bedroom. According to Howard, he got into bed after he finished eating his pizza. The television and the light were on, and the bedroom door was open. Howard

testified that he fell asleep watching the Super Bowl. Howard testified as follows about what happened next:

> Yeah, so I was in bed asleep and I find somebody crawl in bed and lay three quarters across my chest and legs. * * * Felt the tugging and caressing of my beard and kissing. * * * And then I began to start to kiss back. * * * Then * * * my hand was on the back from the left side, start caressing, start rubbing, working my way down.

{¶ 30} According to Howard, C.S. "initiated" the kissing. Howard testified that C.S. has "never laid in the bed with me." Howard also testified that when he woke up to C.S. kissing him, the television and light were off. Howard explained that the television will go into "dark mode" after a period of nonuse, but he did not turn the bedroom light off. Howard did not recall whether the bedroom door was open or closed.

{¶ 31} Howard testified that C.S. "had her thighs, leg sliding right against my private areas." Asked if "at that time could you tell that it was" C.S., Howard answered as follows: "Yeah, shortly after that, I knew it wasn't Shonniece." After realizing the woman in bed with him was C.S., Howard "started to get aroused [and] just started returning the affection." Asked if C.S. ever told Howard to stop "or any of those words to that effect," Howard answered, "No." Howard testified that he did not restrain or threaten C.S. According to Howard, he touched and kissed C.S.'s breasts and "went down to give oral" to C.S. Howard testified that C.S. was not crying when this encounter occurred. Rather, Howard stated that C.S. was "moaning."

{¶ 32} Howard testified that no other sexual activity between him and C.S. occurred. Specifically, Howard denied penetrating C.S.'s vagina with his penis, stating that he suffers from erectile dysfunction. Howard did not testify about whether or not he digitally penetrated C.S.'s vagina.

{¶ 33} Howard testified that C.S. left his house that night, and he denied moving C.S.'s car. Howard stated as follows regarding the phone call between him and C.S. that was played for the jury:

> We had sex, but it should have never happened between us. I had always looked at her as a daughter, treated her as a daughter. We had sex and I just could not wrap my head around it. I could not stop beating myself up mentally over it. I mean, to the point where I'm sleeping an hour, two hours at a time in the middle of the night then shaking to wake up just looking around. * * * And then to hear her cry destroys me. It always has.

{¶ 34} On cross-examination, the state asked Howard the following question after Howard testified that his penis did not penetrate C.S.'s vagina: "Why do we find your DNA inside [C.S.'s] vagina * * *? [E]xplain why your semen is in her vagina." Howard responded that "if I had any kind of leakage, anything on my shorts, or she got on top where the opening is in my boxer brief, yeah, there's my penis right there." According to Howard, "[t]here was no crying when [he and C.S.] had sex," and C.S. was "lying about that."

## III. Law and Analysis

{¶ 35} For ease of discussion, we address Howard's assignments of error out of order.

### A. Third Assignment of Error

{¶ 36} In Howard's third assignment of error, he raises two issues: sufficiency of the evidence and manifest weight of the evidence. Specifically, Howard argues that "[a]ll of [his] convictions were improper as the evidence presented at trial was insufficient and inadequate to prove beyond a reasonable doubt that [he] compelled C.S. to submit to sexual conduct by means of force or threat of force, an element essential to all the offenses." Howard argues in the alternative that "the evidence presented at trial was insufficient and inadequate to prove that [he] digitally penetrated C.S.," which applies only to one of this three rape convictions.

#### 1. Sufficiency of the Evidence

{¶ 37} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

#### 2. Manifest Weight of the Evidence

{¶ 38} A manifest weight of the evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d

382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### 3. Force

{¶ 39} Pursuant to R.C. 2901.01(A)(1), "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." This definition applies to charges of rape and GSI that are based on "force or threat of force." R.C. 2907.02(A)(2); 2909.05(A)(1). Force or threat of force "can be inferred from the circumstances surrounding sexual conduct * * *." *State v. Schaim*, 65 Ohio St.3d 51, 55, 600 N.E.2d 661 (1992). *See also State v. Szorady*, 8th Dist. Cuyahoga No. 95045, 2011-Ohio-1800, ¶ 33.

### a. Forcible Rape

{¶ 40} R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.01(A) defines "sexual conduct" as follows:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal

or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 41} Upon review, we find the following evidence in the record concerning "force" as it relates to rape. C.S. testified that, when she woke up, she "felt like a dead body," she felt like she "couldn't move," and she was "just paralyzed." Howard took her pants and underwear off. The lights were off, the television was off, the bedroom door was closed, and C.S.'s keys and phone were missing. She "knew" what was about to happen, and Howard was "on top of" her. She did not "fight him off" because of his size.

{¶ 42} Evidence in the record established that Howard weighed 295 pounds at the time, and C.S. weighed approximately 100 pounds. C.S. testified that she "cried the whole time" and she "was bracing" herself "for the fact that he [was] going to rape [her] and then kill [her] right afterwards." C.S. further testified that Howard "turned" her onto her stomach and put his penis inside her vagina. "He pushed my shoulder. He turned me over, grabbed my shoulders, and turned me specifically like this by using his hand to push me over to my stomach from my side."

{¶ 43} Howard, on the other hand, testified that he was asleep in bed when C.S. "crawled" into bed with him and started to "caress" and kiss him. Howard "just started returning the affection." According to Howard, he did not restrain or threaten C.S., and C.S. did not cry.

### b. Forcible GSI

{¶ 44} R.C. 2907.05(A)(1) states that "[n]o person shall have sexual contact with another * * * [w]hen * * * [t]he offender purposely compels the other person

* * * to submit by force or threat of force." R.C. 2907.01(B) defines "sexual contact" as follows: "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 45} Upon review, we find the following evidence in the record concerning "force" as it relates to GSI. C.S. testified that, when she woke up, Howard had "lifted" her sports bra and shirt, and Howard touched her breasts with his hands and mouth. C.S. also testified that Howard "kept trying to force his tongue into [her] mouth." C.S. further testified that Howard pulled her pants down and put his mouth on her vagina.

### c. Analysis of Force

{¶ 46} In following the precedent of this district, we find that the state presented sufficient evidence of force to support Howard's convictions for rape and GSI. *See State v. Blankenship*, 8th Dist. Cuyahoga No. 77900, 2001 Ohio App. LEXIS 5520 (Dec. 13, 2001) (finding that a rape victim's "testimony, if believed, is sufficient to prove each element of the offense * * *. There is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction.").

{¶ 47} In *State v. Bradley*, 8th Dist. Cuyahoga No. 98216, 2013-Ohio-485, this court affirmed the defendant's GSI conviction under circumstances similar to the case at hand. The victim was Bradley's 23-year-old daughter, and this court found that Bradley used force to have sexual contact with her. "K.B. testified that she fell asleep wearing a shirt and shorts but when she woke up her shorts were

completely removed and her shirt was up above her chest. Bradley was standing above her, exposing himself, and used his hands to touch her inner thigh and try to push her legs apart." *Id.* at ¶ 24. "This court has held that separating a victim's legs and pulling down the victim's clothing while the victim sleeps can only be accomplished through force. * * * This court has also previously held that the manipulation of a sleeping victim's clothing in order to facilitate sexual contact can constitute force under R.C. 2901.01(A)(1) even though such force requires only minimal physical exertion." *Id.* at ¶ 22-23. *See also State v. Graves*, 8th Dist. Cuyahoga No. 88845, 2007-Ohio-5430, ¶ 28 ("Graves pulled down M.S.'s pants and said act satisfies the element of force."); *State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 17 ("In the situation where the victim is sleeping and thus not aware of the defendant's intentions, only minimal force is necessary to facilitate the act.").

{¶ 48} We further find that, as to the use of force, Howard's convictions for rape and GSI are not against the manifest weight of the evidence. This court has consistently held that "when considering a manifest weight challenge, the trier of fact is in the best position to take into account inconsistencies, along with the witness's manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible." *State v. Holloway*, 8th Dist. Cuyahoga No. 101289, 2015-Ohio-1015, ¶ 42. In reviewing C.S.'s testimony, which is consistent with Robinson's testimony and the rape-kit report, we cannot say that the

jury lost its way in finding C.S. credible and in finding that Howard used force against her concerning his forcible rape and forcible GSI convictions.

### 4. Digital-Penetration Rape

{¶ 49} Howard next argues under his third assignment of error that his conviction for rape in Count 3 is not supported by sufficient evidence and is against the manifest weight of the evidence. Count 3 of Howard's indictment states that he "did engage in sexual conduct, to wit: digital penetration, with [C.S.] by purposely compelling her to submit by force or threat of force." Specifically, Howard argues that the only evidence of digital penetration was Robinson stating that "on the forensic report [C.S.] filled out, she checked the block indicating there had been digital penetration." Howard further argues that neither he nor C.S. provided any testimony "regarding digital penetration."

{¶ 50} By Howard's own admission on appeal, there is sufficient evidence to convict him of digital-penetration rape as shown by Robinson's testimony and the rape-kit report, which both indicate that Howard's fingers penetrated C.S.'s vagina.

{¶ 51} We turn to whether Howard's conviction for digital-penetration rape is against the manifest weight of the evidence in the record. Upon review, we find that Howard did not testify specifically about digital penetration. Rather, Howard denied that sexual conduct other than oral penetration occurred. C.S., on the other hand, answered as follows when asked if "anything [was] going inside of your vagina outside of [Howard's] tongue": "I don't remember. He just performed oral and was pleasuring himself. I don't remember." C.S. was also asked how she knew that

Howard's penis penetrated her vagina. C.S. answered, "Because he was moving his hands to be able to put it in."

{¶ 52} Additionally, Robinson testified that C.S. answered "yes to vaginal" when asked if Howard's finger penetrated anything. This is bolstered by information in C.S.'s rape-kit report indicating that Howard digitally penetrated her vagina. In other words, Robinson testified that the only reason she wrote the word "yes" next to digital penetration on the rape-kit report is because C.S. told her that was true.

{¶ 53} Upon review, we find that the weight of the evidence in the record does not go against Howard's conviction for digital-penetration rape. A reasonable jury could have found Howard guilty of this offense by believing Robinson's testimony, the rape-kit report, and C.S.'s testimony that Howard used his hands to put his penis in her vagina. Although we acknowledge that C.S. first testified she did not remember if anything was "going inside" her vagina other than Howard's tongue, Ohio courts have consistently held that a "trier of fact is free to believe all, some, or none of the testimony of each witness testifying at trial. * * * Thus, a conviction is not against the manifest weight of the evidence 'solely because the jury heard inconsistent or contradictory testimony.'" *State v. Penland*, 2023-Ohio-806, 210 N.E.3d 1103, ¶ 51 (8th Dist.), quoting *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72. *See also State v. Nitsche*, 8th Dist. Cuyahoga No. 103174, 2016-Ohio-3170, ¶ 45 ("[A] defendant is not entitled to reversal on

manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory.").

{¶ 54} Upon review of the evidence presented at trial, we find no basis to conclude that the jury lost its way and created a manifest miscarriage of justice concerning Howard's conviction for digital-penetration rape. The jury was in the best position to weigh the credibility of the trial testimony and evidence, and we will not disturb this verdict on appeal.

{¶ 55} Accordingly, Howard's third assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 56} In Howard's second assignment of error, he argues that he was deprived of constitutional rights as a consequence of prosecutorial misconduct. Specifically, Howard argues that the state engaged in misconduct when it asked him how his DNA and semen was found in C.S.'s vagina if, as Howard testified to, he and C.S. only engaged in oral sex. Howard argues that this line of questioning amounts to misconduct because no evidence was ever presented regarding DNA or semen. Howard further argues that the state engaged in misconduct when it repeated this same "misinformation" during closing arguments by stating that there was evidence of Howard's semen from two sources: C.S.'s medical record and Howard's admission.

1. **Prosecutorial Misconduct — Standard of Review**

{¶ 57} The Ohio Supreme Court set forth the following test regarding prosecutorial misconduct:

To evaluate allegations of prosecutorial misconduct, we "must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected [the defendant's] substantial rights." [Sic] *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 121. Because prosecutorial misconduct implicates due-process concerns, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). We "will not deem a trial unfair, if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even" absent the misconduct. *LaMar* at ¶ 121.

*State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 162.

## 2. The Misconduct in Question

{¶ 58} The following colloquy occurred during Howard's case-in-chief, when the prosecutor cross-examined Howard:

Q: And, you know, typically I don't want to — when I cross a defendant, I don't want to start with this, but I have to.

You just told the Ladies and Gentlemen of the Jury that you didn't penetrate her vagina, right?

A: Yes.

Q: With your penis, I should say. With your penis?

A: Yes.

Q: Why do we find your DNA inside her vagina then, Mr. Howard? Explain that to them. Turn to them and explain why your semen is in her vagina. Please. I'll wait.

{¶ 59} The prosecutor further stated the following to Howard: "And your semen magically appeared in her —"; "And your semen ended up inside her vagina

—"; "So you don't know there is semen inside the victim's vagina?"; and "You are telling me now all of a sudden you don't know your semen is in her vagina, correct?"

{¶ 60} Additionally, during closing argument, the prosecutor stated as follows: "To stand here and argue to you that his semen isn't in that rape kit is ridiculous. It's untrue. He admitted that to you."

### 3. Prosecutorial Misconduct Analysis

{¶ 61} C.S.'s rape-kit report contained the following information: Under a heading entitled "detailed body surface findings," Robinson observed, through "Direct Visualization" and "Colposcope/Alternate Light Source," "Dried Stains" on C.S.'s head, breasts, thighs, back, and hands. Robinson also noted in the report that "blind sweeps for internal swabs collected[.] [C.S.] declined speculum" examination. It is undisputed that no follow-up evidence was introduced at trial concerning these "dried stains" or "blind sweeps." In other words, there is no mention of DNA or semen in the rape-kit report.

{¶ 62} C.S. testified that, during the rape examination at the hospital, "[t]hey swabbed my whole body. They collected DNA with the rape kit." This testimony is the only evidence in the record about DNA. There is no evidence in the record whatsoever about semen.

{¶ 63} Howard's attorney repeatedly objected to the state's line of questioning regarding DNA and semen, stating that "[t]here was no medical evidence admitted by the State of Ohio with regards to the semen." The court repeatedly overruled defense counsel's objections.

{¶ 64} In applying the prosecutorial misconduct test to the case at hand, we first find that the prosecutor's conduct in questioning Howard about his DNA and semen that was "found" in C.S.'s vagina was improper. It is unequivocal that the state did not present any evidence concerning Howard's DNA and semen, or anybody's DNA and semen for that matter.[1]

{¶ 65} We further find that Howard did not admit that his semen or DNA was found in C.S.'s vagina. To take the words of the prosecutor himself, for the state to argue that Howard's semen is in the rape-kit report is "ridiculous." *See State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984) ("[A]n attorney is not to allude to matters which will not be supported by admissible evidence * * *. Such conduct is well beyond the normal latitude allowed in closing arguments and is clearly improper.").

{¶ 66} Having found that the prosecutor's comments and questions were improper, we turn to the second prong of the prosecutorial misconduct test. We look to the following factors to determine whether these improper comments and questions were prejudicial: "(1) the nature of the remarks, (2) whether an objection

---

[1] On appeal, the state argues in part as follows: "The State will assume that [Howard's] counsel has not reviewed the trial discovery in this case. Had counsel reviewed it, counsel would find out that [Howard's] semen was, in fact, found in C.S.'s rape kit. Unlike [Howard], the State will not argue why those witnesses did not testify since it is outside the record. However, that does not change the fact that the information exists."

The state essentially admits that any information concerning Howard's semen was "outside the record." It is axiomatic that convictions must be based on evidence produced at trial. *See, e.g., State v. Waddy*, 63 Ohio St.3d 424, 436, 588 N.E.2d 819 (1992) ("Of course, a prosecutor may not deliberately misstate evidence or argue facts not in the record.").

was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995).

{¶ 67} Although we cannot stress enough how improper these unsupported questions and comments were, we are not able to say that they affected the outcome of Howard's trial. We found that Howard's convictions were supported by sufficient evidence in the record and were not against the manifest weight of the evidence. The evidence consisted primarily of C.S.'s detailed testimony about the events that occurred on the night in question. This testimony is substantially similar to the narrative account that C.S. gave Robinson hours after Howard sexually assaulted her. Robinson's testimony and the rape-kit report support C.S.'s testimony. For the same reasons that we overruled Howard's third assignment of error, we find that Howard was not prejudiced by the prosecutor's improper questions and comments in the case at hand.

{¶ 68} Accordingly, Howard's second assignment of error is overruled.

## C. First Assignment of Error

{¶ 69} In Howard's first assignment of error, he raises three issues: denial of continuance, meaningful opportunity to present a complete defense, and ineffective assistance of counsel. Specifically, Howard argues that "[o]nly [he] testified with respect to his [erectile dysfunction] disorder; had he been able to corroborate his claim through third-party testimony and documentation, it would have created

doubt as to whether C.S. was embellishing her story by adding an allegation of vaginal intercourse."

### 1. Denial of Continuance

{¶ 70} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67, 426 N.E.2d 1078 (1981). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964).

{¶ 71} On August 12, 2022, three days prior to trial, Howard filed a motion for continuance. In this motion, Howard argued as follows:

> * * * due to the fact that defendant is facing possible conviction on an eight count (8) count indictment, counsel finds it imperative that she "pulls out all the stops" in advocating on his behalf. Accordingly, per information recently provided to counsel via [a] Private Investigator, counsel has been advised that documents have been recently subpoenaed, which could prove imperative to defendants' defense, and in addition the private investigator further provides that there's potential testimony from witnesses from whom she has yet to interview, which could further be crucial to defendants' defense.

{¶ 72} Attached to Howard's motion was an affidavit from a private investigator who stated that she was retained to work on the case at hand in March 2022; she has a "significant case load"; she has "spent many hours investigating" other cases, but she needs "additional time to track and locate all necessary

witnesses" and "acquire related * * * medical records" concerning Howard's case; and she "just discovered on August 8, 2022, * * * something * * * that is very critical * * *."

{¶ 73} On August 15, 2022, prior to trial commencing, defense counsel renewed Howard's motion for continuance, which had not yet been ruled on. The court denied this motion, stating that the "last time I granted it[,] I indicated very clearly that that was the last continuance."

## 2. Meaningful Opportunity to Present a Complete Defense

{¶ 74} Howard argues on appeal that "if [he] had been able to establish that vaginal intercourse was not possible," by presenting corroborating evidence concerning his alleged erectile dysfunction, it would have called into question C.S.'s credibility when she testified that his penis penetrated her vagina. Howard further argues that this issue "could not be explored or answered at trial because the court refused [his] reasonable request for a continuance, needed to give his investigator additional time to complete her investigation of [his] medical records and procure witnesses to testify on his behalf."

{¶ 75} Our review of the record shows that, if Howard was unable to present a "complete defense," it was not because the court denied his requests for continuance three days before trial and on the day of trial. We think it is a reasonable presumption that Howard was aware of his own erectile dysfunction. And Howard became aware that C.S. accused him of rape, in which his penis penetrated her vagina, on August 17, 2020, when he was indicted. Two years later,

in August 2022, Howard requested a continuance to explore this issue that surfaced at the time of his indictment. We cannot say that the court abused its discretion, or thwarted Howard's opportunity to present a complete defense, by denying his last-minute motion for continuance. *See State v. Sanders*, 92 Ohio St.3d 245, 276, 750 N.E.2d 90 (2001) (finding no abuse of discretion when the court denied the defendant's request for a continuance to "prepare for trial" because "[l]ead counsel was appointed nearly two months before trial" and "co-counsel had been on the case fifteen months before trial * * *").

### 3. Ineffective Assistance of Counsel

{¶ 76} To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id*. at 697. *See also State v. Bradley*, 42 Ohio St. 3d 136, 538 N.E.2d 373 (1989).

{¶ 77} Our review of the trial transcript in this case shows that Howard testified he had erectile dysfunction. "So I suffer from erectile dysfunction. Took me a couple of years to actually go to a doctor to see about it. I have been on medication since 2017. And to prepare for sex, you would have to take the pill at least an hour ahead of time." Nothing in the record suggests that Howard was

prejudiced because he did not present evidence corroborating his claim of erectile dysfunction. Furthermore, Howard does not identify with particularity, beyond "medical records" and "witnesses," what information his investigator needed more time to find. *See State v. Krzywkowski*, 8th Dist. Cuyahoga Nos. 83599, 83842, and 84056, 2004-Ohio-5966, ¶ 22, quoting *State v. Glover*, 12th Dist. Clermont No. CA2001-12-102, 2002-Ohio-6392, ¶ 25 ("In many criminal cases, trial counsel's decision not to seek expert testimony 'is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.'") As such, Howard has failed to establish the prejudice prong of the *Strickland* test.

{¶ 78} Upon review, we find that the court did not abuse its discretion when it denied Howard's last-minute request for a continuance, Howard was not deprived of the opportunity to present his defense, and Howard's counsel did not render ineffective assistance. Accordingly, Howard's first assignment of error is overruled.

{¶ 79} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

ANITA LASTER MAYS, A.J., CONCURS WITH THE MAJORITY AND CONCURS WITH THE SEPARATE CONCURRING OPINION;
KATHLEEN ANN KEOUGH, J., CONCURS (WITH SEPARATE OPINION)

KATHLEEN ANN KEOUGH, J., CONCURRING:

{¶ 80} I concur with the majority's decision, but write separately to address the prosecutor's line of questioning during Howard's testimony regarding the presence of his semen in the victim's vagina. As the majority pointed out, the state presented absolutely no evidence or testimony to the jury during the trial that Howard's semen was found in the victim's vagina. Although the victim testified that Howard engaged in vaginal intercourse with her, she did not know if Howard had ejaculated. Her testimony was consistent with Robinson's testimony that the victim told her during the exam that the victim did not know if Howard had ejaculated. Finally, Robinson testified that she swabbed areas that the victim mentioned may have been touched, but the state did not present any forensic testimony or evidence about the presence of any DNA taken from the victim or found in the rape kit.

{¶ 81} Howard admitted that he engaged in oral sex with the victim. Accordingly, it is undisputable that Howard's DNA by means of saliva would be present in the victim's rape kit. But Howard denied that he had vaginal intercourse with the victim. Accordingly, it was within the province of the jury to determine

whether the victim or Howard was more credible.  However, the state attempted to tip the credibility scale in its favor by making unsupported assertions.

{¶ 82} If the state had evidence of Howard's DNA in some form other than saliva, it should have presented that evidence rather than attempt to permeate the trial by commenting on evidence outside the record.  Instead, the state used unsupported innuendo to "prove" that Howard's semen was present in the victim's vagina.  To further exacerbate the improper line of question, the state during closing argument, claimed that Howard admitted to the presence of his semen in the victim's vagina.  This is simply not true.

{¶ 83} However, I cannot entirely fault the prosecutor because the mistake arguably rests with the trial court by allowing the questions.  Howard's defense counsel repeatedly objected to the prosecutor's questioning, stating that no forensic evidence or testimony was admitted regarding the presence of semen.  *See* tr. 566-567.  The trial court as the gatekeeper of evidence should not have allowed the state to continue with its line of questioning absent some credible showing that the state had a good faith belief for its assertions.  *State v. Gillard*, 40 Ohio St.3d 226, 231, 533 N.E.2d 272, 535 N.E.2d 315 (1988) (a cross-examiner may ask a question if the examiner has a good-faith belief that a factual predicate for the question exists).  "The scope of cross-examination * * * lies within the sound discretion of the trial court, viewed in relation to the particular facts of each case."  *State v. Metcalf*, 12th Dist. Butler No. CA2010-12-326, 2012-Ohio-674, ¶ 26, citing *State v. Cox*, 12th Dist. No. CA2000-07-144, 2001 Ohio App. LEXIS 2829, 4 (June 25, 2001), citing *State v.*

*Acre*, 6 Ohio St.3d 140, 145, 451 N.E.2d 802 (1983). In *Metcalf*, this court found that the trial court abused its discretion in allowing the state to mischaracterize DNA evidence, but found no prejudice because the improper characterization occurred only in two instances. *Id*. at ¶ 27-28. Much like *Metcalf*, this case highlights the importance of a trial court understanding the impact of DNA evidence, its presence, and characterization. In cases involving the balancing of credibility, DNA evidence and testimony often tips the scale in favor of one side or the other because most often, DNA evidence is irrefutable.

{¶ 84} The problem for Howard, however, is that he did not assign as error the trial court's decision overruling his objections and thus allowing the state to ask questions that it may or may not have had a good faith basis for asking. The assignment of error he raises focuses on the prosecutor's conduct — not the trial court's discretion. When the trial court repeatedly overruled Howard's objections, the prosecutor was not entirely precluded from continuing with its line of questioning.

{¶ 85} Based on the assignment of error raised and the entire record, including Howard's admissions regarding his conduct, the jury's verdict revealing that it carefully considered each count separately, and the evidence presented, I cannot say that the state engaged in such misconduct to infect the entire trial, which would have denied Howard a fair trial. Accordingly, I concur with the majority's decision to affirm the convictions.