[Cite as *State v. Lett*, 2026-Ohio-1709.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 24CA43 |
| Plaintiff-Appellee, | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| v. | : | |
| Dacoma Lett, | : | **RELEASED 5/5/2026** |
| Defendant-Appellant. | : | |

_____

<u>APPEARANCES</u>:

Timothy B. Hackett, Assistant Public Defender, Columbus, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Alisa Turner, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.
_____

Hess, J.

{¶1} Dacoma Lett appeals the judgment of the Ross County Court of Common Pleas convicting him of two counts of rape, first-degree felonies, and two counts of attempted rape, second-degree felonies, following a jury trial. Lett contends that prosecutorial misconduct denied him a fair trial and due process of law. He contends that the prosecutor: (1) misrepresented scientific evidence and misstated the counts in the indictment during closing argument and (2) did not correct misleading witness testimony that created false impressions for the jury. Next, Lett contends that his convictions were against the manifest weight of the evidence because: (1) the victim's testimony was inconsistent, contradictory, and uncorroborated; (2) the State misrepresented the probative value of certain scientific evidence; and (3) the jury's questions during

deliberations showed confusion about the evidence and that they had lost their way. Last, and alternatively, Lett contends that the convictions on counts one, three, and four were not supported by sufficient evidence because the State failed to provide sufficient evidence of force or substantial impairment.

{¶2}   We find that prosecutorial misconduct in the misrepresentation of the DNA reports and the DNA and Y-STR expert witnesses' testimony deprived Lett of a fair trial. We sustain his first assignment of error, reverse his conviction, and remand for a new trial. His second assignment of error is moot. We overrule his third assignment of error and find that the State presented sufficient evidence of force to support the convictions as a matter of law. We reverse the trial court's judgment and remand for a new trial.

## I.  FACTS AND PROCEDURAL HISTORY

{¶3}   In December 2022, a Ross County grand jury indicted Lett of: (1) one count of rape by force or threat of force in violation of R.C. 2907.02, a first-degree felony (count one); (2) one count of rape by substantial impairment in violation of R.C. 2907.02, a first-degree felony (count two); (3) one count of attempted rape in violation of R.C. 2923.02 and R.C. 2907.02(A)(2) (attempted rape by force), a second-degree felony (count three); and (4) one count of attempted rape in violation of R.C. 2923.02 and R.C. 2907.02(A)(1)(c) (attempted rape by substantial impairment), a second-degree felony (count four). Lett pleaded not guilty and the matter proceeded to trial. The trial ended in a mistrial with a hung jury.  A second trial was held nine months later.

{¶4}   Joshua Nickell, a patrol officer with the Chillicothe Police Department, testified that he was dispatched to the Adena Medical Center in reference to an alleged sexual assault.  He met with and interviewed the victim, B.H.  Officer Nickell took B.H.'s

initial statement and collected the sexual assault evidence collection kit from the sexual assault nurse examiner (S.A.N.E.), Julie Fairchild. Officer Nickell then turned the case over to the detectives and took no further action.

{¶5}     Julie Fairchild, a registered nurse and S.A.N.E. forensic nursing coordinator with Adena Health Systems, testified that she met with B.H. and performed a sexual assault examination and collected evidence. Nurse Fairchild testified that she probably started her examination at approximately 1:15 p.m. on Monday, February 28, 2022 and finished it about two hours later. Nurse Fairchild collected swabs from the vaginal and anal areas, fingernails, and B.H.'s mouth, cheeks, and lower gums. She also collected a DNA reference swab to pick up B.H.'s DNA to use in comparison.  Nurse Fairchild testified that typically she collects underwear, but in this instance B.H. was not wearing any so she collected B.H's pants, which B.H. informed her were the pants she wore immediately after the sexual assault.  Nurse Fairchild also collected a pubic hair combing, which would determine if the pubic hair area contained foreign hair or debris. Nurse Fairchild also interviewed B.H. as part of the examination and prepared an assault history and examination notes. Nurse Fairchild testified that her notes indicate that B.H. informed her that she was assaulted on two different occasions and was penetrated vaginally by Dacoma Lett with his penis. Nurse Fairchild testified that B.H. had no visible injuries on her body.

{¶6}     B.H. testified that on Saturday, February 26, 2022, she and two friends went to a liquor store and she purchased a fifth of cognac and went to a bar in Chillicothe, Ohio. B.H. had consumed about half the bottle of cognac and was consuming double shots at the bar. Her two friends left the bar and B.H. ended up socializing with some of her

cousins, Fredrick Lett, Liza Lett, and Dacoma Lett, and their friend, Josh Peoples. B.H. testified that Dacoma Lett was outside the bar sitting in his sister's car because he was not old enough to be inside the bar. B.H. testified that she left the bar and went outside. Dacoma was sitting in his sister's car. B.H. joined him and sat in the passenger seat. B.H. testified that they listened to music, drank together, and B.H. smoked "a blunt." B.H. eventually went back inside the bar. B.H. testified that she was "overly intoxicated" and had no way to get home, no car, and had been smoking marijuana "throughout the night" as well. She asked Josh Peoples if she could stay at his house for the night.

{¶7} After the bar closed at approximately 2:30 a.m., B.H. went with Josh, her cousins Fredrick and Dacoma Lett, and another female named Quintavia to Josh Peoples' apartment. After she got to Josh's apartment, she set her stuff down and continued drinking and listening to music. B.H. testified that she had previously stayed with Josh a few weeks earlier, had been to his apartment at least twice before, and felt safe because the people she was with were family. On the occasion previously that she was at Josh's apartment a few weeks earlier, she was there with Josh, Fredrick, and one of B.H.'s friends. B.H. had been talking, drinking, and hanging out with all of them, including Dacoma, throughout the night. B.H. estimates that they arrived at Josh's apartment at about 2:45 a.m. on Sunday, February 27th. B.H. testified that it would have been easy for anyone to tell that she was overly intoxicated that evening.

{¶8} B.H. described Josh's apartment as being a studio with everything "compacted together in a box." The living room and kitchen area were open and there was a bedroom and bathroom off to the side. The living room had a television, two connected recliners, a futon, and a long couch. Josh's bedroom had just a bed in it.

Initially B.H. was on the futon and Dacoma and Quintavia were on the couch, and Josh and Fredrick were on the recliners.  B.H. started to feel nauseous and hot and went to lay down in Josh's bedroom on the bed. She took her clothes off, folded them, put them by the headboard, and laid down. However, she started to feel very sick. At that point, Josh had gone to bed and was lying next to her. The music was off and it did not appear as if anyone else was awake. B.H. got up and went into the bathroom, took a shower, and vomited in the shower and yelled for her cousin Fredrick. B.H. called for Fredrick to help her because she believed he was in the living room asleep on the recliner. Fredrick brought her a towel, a trash can, and a bottled water and took her back to the couch where she passed out. The only other person she saw in the living room at that time was Fredrick, who was in the recliner. There was nobody on the futon and there was nobody at the other end of the couch with her. After Fredrick helped her, he returned to the recliner and appeared to go back to sleep.

{¶9}    B.H. testified that the next thing that happened was that she woke up with extreme pain in her stomach, laying on her back with Dacoma Lett on top of her and his penis inside of her vagina.  B.H. testified that she was wrapped in a towel and a blanket but did not have any clothes on. She testified that she told Dacoma to get off of her in a very quiet voice because she was afraid of waking someone up, but he wouldn't stop, "so I tried to slide myself up to get away from him and getting away from him, I twisted my ankle trying to get to the other room, cause I thought to myself, if I put myself in the room with somebody else, he is not going to come in here to touch me." B.H. got up off the couch to go to Josh's bedroom and as she did, she saw Fredrick Lett still lying on the recliner, sleeping. B.H. went to Josh's bedroom where he was sleeping and sat down on

the edge of the bed and considered what to do.  B.H. testified that she went back and got in the shower and turned the water on, "but as I was standing there, I was like, I am going to rinse away anything if I go to the police, like there's going to be nothing there to prove my point. So I got out of the shower, I didn't wash up with soap or nothing, I just got out."

{¶10}  B.H. testified that after she got out of the shower, she went and laid down in the bed next to Josh again and fell asleep. She woke up again because she "felt something touching my butt, him trying to get back in from behind, and it was Dacoma Lett, again."

Q: Okay, when you say him trying to get back in from behind, what do you mean?

A: He was trying to penetrate me from behind.

Q: With what?

A: His penis.

{¶11}  B.H. testified that she was no longer drunk. She got up, was angry, and asked Dacoma what he was doing and told him to get away. B.H. testified that Dacoma responded by telling her repeatedly to come here.  B.H. testified that Dacoma eventually went back into the living room. B.H. got up, plugged her phone into the charger and, at approximately 1:16 p.m. on Sunday, February 27th, she called a friend to come pick her up. Nobody other than Dacoma was in the apartment when he woke her up the second time. After B.H. called her friend, she looked for her underwear but could not find them, so she put on her leggings and shirt and waited on the bed for her friend to arrive. Before her friend arrived, Fredrick and Josh came into the apartment with food from Wendy's sometime between 1 p.m. and 2 p.m.  B.H. did not tell them what had happened.

**{¶12}** After B.H. left the apartment, she went to her friend's house and called her mother and Dacoma's sister and told them what happened. B.H. smoked some marijuana at her friend's house and contemplated whether to seek medical attention or notify the police. B.H. testified that she got to her friend's house at approximately 2:15 p.m. Sunday afternoon and was still experiencing abdominal pain. B.H. stayed at her friend's house until approximately 11:00 p.m., when she went to the Adena Hospital where they performed several exams and administered medication. She spoke to the S.A.N.E. nurse and was further examined. B.H. testified that she did not know whether Dacoma ejaculated in her or not. She was in the Adena Hospital from the late evening, Sunday, February 27 to Monday, February 28, 2022.

**{¶13}** B.H. testified that she had consensual sex on Friday evening going into Saturday morning, February 25-26th, and did not experience any abdominal pain following that encounter. B.H. did not identify the person she had consensual sex with but testified that he was not related to Dacoma or Fredrick Lett.

**{¶14}** Allison Mansius, a forensic scientist employed by the Ohio Bureau of Criminal Investigation (BCI), testified about DNA testing. Mansius identified the DNA specimens submitted by law enforcement in this case. DNA analysis was performed on the vaginal swab, anal swab, swab from crotch of pants, and a swab from the pubic hair combings. The results were that the vagina swab contained only B.H.'s DNA, there was no DNA foreign to B.H. The DNA result from the anal swab was that there was no DNA profile, meaning no DNA was detected. Mansius obtained DNA from more than one individual from the swab from the crotch of the pants. There was one major contributor that was consistent with B.H. The minor contributor was at least some portion male but

there was insufficient data to draw a conclusion. There were at least two additional contributors to the crotch of the pants. Similarly, the pubic hair combings swab was not of sufficient quality for comparison due to insufficient data. Mansius created two reports based on her DNA analysis. One report was issued March 25, 2022 and was the DNA testing Mansius performed on the vaginal and anal swabs. After she completed that report, she analyzed the swab from the crotch of the pants and the pubic hair combings and prepared a report issued April 14, 2022.  Mansius sent a sample from the swab of the crotch of the pants for Y-STR analysis, which was different than the DNA analysis Mansius performed.

{¶15} Mansius testified that the samples she tested were positive for acid phosphatase, which is a chemical that can be found in bodily fluids, such as saliva and semen, but it can also be found in other things such as tea and cauliflower. Mansius could not identify the source of the acid phosphatase in the samples and could not say that it was from semen. Mansius also testified that the swab from the crotch of the pants had a mixture, meaning there were at least three contributors to the DNA sample from the pants. Mansius was unable to identify a contributor for the DNA sample from the crotch of the pants. Mansius testified that stacking is a condition where there is a mixture in a DNA sample and people in the sample have the same type of DNA and this falsely elevates a type within the sample. Mansius also testified that the sample from the pubic combing did not have sufficient DNA for her to make any conclusions. Mansius testified that DNA can be transferred anytime there is contact. Mansius "can never say how DNA got on a sample" because DNA exists throughout the body.

**{¶16}** Logan Schepeler, a forensic scientist employed with BCI, testified that he performed a specialized type of DNA testing called Y-STR analysis. Schepeler testified that the main difference between DNA testing and Y-STR analysis is that the latter is male-specific, "It's often used in a situation where there is a lot of female DNA on a sample that's identified with the traditional testing. It's kind of like a needle in a haystack, where the haystack would be the female DNA. We are able to remove that haystack and we are left only able to visualize the needles, in which case would be the male DNA." Schepeler testified that there are limitations to this testing, "The Y-STR testing is not unique to the individual. In the traditional testing, other than identical twins, everyone will have different DNA. That's not the case with the Y-STR. We are testing the Y chromosome which is passed directly from a father to any of his sons, down a paternal line. So, father, a father's father, father's father's father, you get the point, but it is not unique to an individual." Schepeler analyzed the swab from the crotch of the pants and the two DNA standards from the oral swabs from Dacoma Lett and Fredrick Lett.

**{¶17}** Schepeler testified about the results from the Y-STR testing: "The Y-STR results from the swabbing from the inside of the crotch of the pants resulted in a mixture, which means more than one male's DNA was present on the sample. There was a major contributor in the mixture and that major contributor was consistent with Dacoma Lett." Schepler compared the sample with Fredrick Lett and concluded, "Fredrick Lett was not the major contributor on the sample."

**{¶18}** After Schepeler completed his analysis, he calculated a statistic, which "estimates how rare or how common the DNA profile from the evidence would be found in the general population." Schepeler explained, "For Y-STR, it is based on a search of

a database that has, in this case, around 29,000 Y-STR profiles and I am using the profile from the evidence and searching it against those 29,207 profiles in the database and seeing if that profile from the pants has been observed out of these 29,000. In this case, there were zero observations in the database. So, statistical estimate is one in 9,750 males in the United States. . . . Based on the database that I used to search, that's actually the largest statistic that I would report in Y-STR, again, based on that database size. If that database were larger, the statistic may be larger, but that is actually the largest statistic that I would report with that database . . . Because the profile had not been observed in that database, the statistic could not get larger."

> Q: Okay. So, Okay. All right. So, what is the likelihood that it was Dacoma Lett's DNA that you found from that swabbing?
>
> A: Well, I can say that the major contributor is consistent with Dacoma Lett. I would expect, based on that statistic, that I would find that Y-STR profile one in every 9750 males in the United States.

**{¶19}** Schepeler prepared two reports. The first report he issued May 10, 2022 and was the test results from the crotch of the pants and Dacoma Lett's DNA sample. Schepeler's second report was issued July 15, 2022 and was prepared after he received an additional DNA sample from Fredrick Lett. In the second report, Schepeler concluded, "Frederick Lett is not the major contributor on that sample from the pants."

**{¶20}** Schepeler testified that on both of his reports he concluded that Dacoma Lett could not be eliminated as the major source of the Y-STR profile.

> Q. He cannot be eliminated, but you cannot for certainty say that is his?
>
> A. I can only say it is consistent with him. I wouldn't call it exclusive. I would just say - - I can say it is consistent with him.

**{¶21}** Schepeler testified that the Y-STR DNA can be transferred in the same manner as traditional DNA, "Transfer can occur when any item, object, containing DNA comes into contact with another item or object or person. The DNA from the first item could leave some DNA on the second item during that contact." Schepeler testified that there was a mixture, at least more than one male's DNA present on the swab from the crotch of the pants. Schepler also testified that he is unable to tell where the Y-STR came from on the body or if it came from a fluid or a skin cell.

**{¶22}** Detective Jeffrey Demint, with the Chillicothe Police Department, testified that he was assigned to investigate the incident. He read the report Officer Nickell prepared and sent the sexual assault evidence collection kit to BCI for analysis. Then Detective Demint interviewed Dacoma Lett on March 2, 2022 at the police department. An audio or video recording of the police interview was not introduced into evidence. Instead, Detective Demint testified about the substance of his interview with Dacoma Lett from memory. Dacoma told Detective Demint that he went to a bar in Chillicothe to get the keys from Josh Peoples to go to Josh's apartment to play video games. Dacoma had contact with B.H. in the parking lot of the bar, and she was upset because she had lost her liquor bottle. Dacoma told Detective Demint that he and B.H. were drinking in a car in the parking lot of the bar. Dacoma and Fredrick Lett went to Josh's apartment and later that evening Josh returned with B.H. and a female named Quintavia. Dacoma told Detective Demint that B.H. was drunk that night when she arrived at the apartment. Dacoma told Demint that he and Quintavia cuddled on the couch throughout the night and they woke up at about 5:00 or 6:00 a.m. that morning and Quintavia went home and Dacoma went to a cousin's house. He then returned three or four hours later but the door

was locked so Dacoma called everyone in the house. Fredrick Lett answered his call and let him back in the house. Dacoma gave two oral swab DNA samples during the interview that Detective Demint sent to BCI. Detective Demint testified that he collected Dacoma's DNA during the middle of the interview and "didn't really question him at that time. I just wanted to establish a timeline for him."  Detective Demint told Dacoma what B.H. had alleged and Dacoma "basically only denied that she ever took a shower in his presence. He, at that time, didn't really deny any of this [sic] sexual encounters. It was basically that she's lying about taking a shower."

**{¶23}** Detective Demint interviewed B.H. "She was very consistent and confident in her statements. The statement she gave me was the same statement she gave to the officer, the same statement she gave to the S.A.N.E. nurse."

**{¶24}** Detective Demint interviewed Fredrick Lett on June 24, 2022. He determined that Fredrick Lett and Dacoma Lett are related via a maternal line and collected a DNA sample from Fredrick Lett. Detective Demint interviewed Josh Peoples, but not until February 22, 2024, nearly two years after the incident. He found nothing of any evidentiary value from that interview. He tried but was unable to locate the female, Quintavia, who had spent the evening in the apartment with Dacoma.

**{¶25}** Detective Demint testified that Dacoma told him that if something like that would have happened, somebody else would have seen or heard it, but Demint did not interpret that as a denial.  Dacoma also told Detective Demint that the entire time he was at Josh's apartment he was with Quintavia. Detective Demint did not obtain a search warrant for Josh's apartment and he did not search it, did not obtain the blankets or towels from it, nor did he attempt to locate underwear. Detective Demint testified that the first

time he interviewed B.H. was on June 22, 2022, four months after she first reported the assault.

**{¶26}** Josh Peoples was called as a defense witness. Peoples stated that on the evening in question he and Fredrick and Liza Lett went to a bar in Chillicothe for some drinks. Peoples saw B.H. at the bar and she was very inebriated. Dacoma Lett was in the area outside but was not in the bar. Peoples said he eventually left with B.H. and Quintavia and two other people who gave them a ride home. Those two people just dropped them off and went on. When he arrived at his apartment with B.H. and Quintavia, Dacoma and Fredrick were already there. They listened to music and drank. Eventually people started to turn in for the night.

**{¶27}** Peoples described his apartment as very small with no doors on anything except the bathroom and everything is within earshot of the rest of the apartment. Peoples testified that B.H. went to his bedroom to lie down and then Peoples went in about a half hour to an hour later. When Peoples went to bed, Dacoma and Quintavia were on the couch and Peoples had turned the music off. Peoples' bed is a California king-size bed and B.H. was sleeping on the side closest to the wall. To get out she would either have to crawl over him or get out at the foot of the bed. Peoples thought that B.H. had removed her shoes but otherwise had some clothes on. Peoples testified that a light from the alley provided enough light for the apartment that a person could navigate by sight in his apartment. Peoples estimated that it was approximately 5:00 a.m. in the morning when he went to bed because Peoples got a text from B.H. at that time asking him to come to the bedroom. The next time he woke up was about 10:30 a.m., the sun was up, Dacoma and Fredrick Lett were in the apartment, B.H. was in his bed, but Quintavia was gone.

**{¶28}** Peoples testified that Dacoma left before Peoples fell asleep because Dacoma poked his head into the bedroom and said he was leaving and Peoples asked him to lock the door when he left. Peoples thinks that Dacoma and Quintavia may have left at the same time. Peoples did not hear anything that night that disturbed his sleep, no crying, shuffling or scuffling. When he woke up that morning, he and Fredrick went on an errand to Speedway for about 15 minutes at approximately 11:00 a.m. After they returned, they decided to go back out and get Wendy's double cheeseburgers and cheeseburgers. Peoples estimated he and Fredrick were probably gone for about another 15 minutes during that trip.

**{¶29}** Peoples testified that when he and Fredrick made their first errand run, Dacoma was awake on the couch and was on the phone with someone and B.H. was asleep in Peoples' bed. And when they returned from the first 15-minute errand, Dacoma and B.H. were both still in the same places and Dacoma was still awake and B.H. was still asleep. Peoples testified that Dacoma and B.H. were in the same positions for the second errand to Wendy's, which he believes they went on approximately 20 minutes after they returned from Speedway. Dacoma was still on his phone and B.H. was still asleep. Peoples believed that Fredrick woke B.H. up when they returned from Wendy's and he yelled out and asked her if she wanted a cheeseburger. B.H. said she did and Fredrick tossed her a cheeseburger. B.H. then "asked if anyone had a blunt wrap." Shortly thereafter, B.H got up and walked out of the apartment and said, "I'll see you all later." Peoples testified that he did not witness any signs of emotional distress from B.H. and she did not mention that anything had happened. Peoples testified that he knew B.H. before that encounter because he had run into B.H. occasionally at bars four or five times

but she had never been to his apartment before. Peoples testified that both Dacoma and Fredrick have spent a lot of time at Peoples' apartment, and he let Dacoma use his bed when Peoples went to work instead of sleeping on the couch. Peoples testified that he believed his friends and family have their DNA scattered about his apartment. Peoples testified that B.H. was in a drunken state and she was "over the top. Some would say obnoxious." "Laughs loud, talks loud. Very."

{¶30} Peoples testified that he also socializes with Dacoma's father and sister, and he has known them all since he was 12 years old and he is now 39 years old. Peoples testified that Dacoma and his father and brother have spent a lot of time in his apartment. Peoples testified that Dacoma's father and his brother are over at Peoples' apartment at various times and that Dacoma's father has spent the night on Peoples' couch several times. Peoples clarified that at some time after 5:00 a.m. Dacoma popped his head into the bedroom and told him he was leaving, then Dacoma came back sometime after that, but before 10:30 a.m. because when Peoples woke up at approximately 10:30 a.m. Dacoma was back. Peoples testified that he did not let Dacoma back into the apartment.

{¶31} Fredrick Lett testified that he started the evening out at Josh Peoples' apartment and then they went to the bar. Fredrick testified that he saw B.H. at the bar and she was drinking. Fredrick testified that everyone was drunk that evening. Fredrick and Dacoma got a ride to Josh's apartment. Fredrick went to sleep in the living room. Fredrick testified that he woke up at some point to get a towel for B.H. who was in the bathroom. Fredrick could not say whether B.H. was dressed or not because he did not look. The towel was on the door, and he just handed it in to her. After he handed her the towel, he went back and laid down. He woke up again because B.H. was making a

commotion in the bathroom. Fredrick testified that when he got up both times, Dacoma was not there. However, Dacoma came back before Fredrick and Josh got up and went on their first errand. Fredrick testified that he let Dacoma back into the apartment.

**{¶32}** The jury convicted Dacoma Lett on all four counts. The trial court merged counts one and two and merged counts three and four. The State elected to sentence Lett on counts one and three. The trial court sentenced him to a minimum 8-year prison term, with a maximum indefinite 12-year prison term on count one and a stated term of 2 years on count three, to be served consecutively. Lett was required to register as a Tier III sex offender. Lett appealed.

## II.  ASSIGNMENTS OF ERROR

**{¶33}** Lett presents the following assignments of error:

I.      Prosecutorial misconduct denied Dacoma Lett a fair trial and due process of law, plainly violating the U.S. Const., amends. V, VI and XIV and Ohio Const. art. I, § 10 and 16. Crim.R. 52 (2.27.24 Tr. 78; Tr. 171, 270-271, 281; Tr. 269-279; Tr. 366-368; Tr. 404).

II.     Mr. Lett's convictions are not supported by the manifest weight of the evidence in violation of the U.S. Const., amends. V and XIV and Ohio Const., art. I, § 16. (Tr.1-414).

III.    Alternatively, the convictions entered on counts one, three, and four are not supported by sufficient evidence, in violation of Crim.R. 29; R.C. 2907.02(A)(2), 2907.02(A)(1)(c); U.S. Const., amends. V and XIV and Ohio Const. art. I, § 16. (Tr. 1-414).

## III.  LEGAL ANALYSIS

### A. Prosecutorial Misconduct

**{¶34}** Lett contends that he was denied a fair trial and due process of law when the prosecutor misrepresented the scientific evidence and misstated the counts in the indictment during closing argument.  He also contends that the prosecutor failed to correct

misleading testimony given by B.H. and Detective Demint, which created false impressions for the jury.

**{¶35}** The State contends that the prosecutor accurately synthesized the evidence presented to the jury in her closing argument. The State argues that Lett mischaracterizes the prosecutor's statements and that all the evidence in the case proves beyond a reasonable doubt that the tested substance from the crotch of B.H.'s pants was Lett's semen. And, even if these statements were improper, Lett has failed to demonstrate that he would not have been convicted without the improper closing statements. The State also contends that B.H. and Detective Demint did not provide false or misleading testimony.

### 1. Legal Standard

**{¶36}** "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " (Citations omitted) *State v. Garrett,* 2022-Ohio-4218, ¶ 144, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "We will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. LaMar*, 2002-Ohio-2128, ¶ 121. Lett's counsel did not object to the prosecutor's remarks during closing argument, so we review for plain error. Plain error is an obvious deviation from a legal rule that affected the outcome of the trial. *Id*. at ¶ 63.

## 2. Remarks During Closing Argument

**{¶37}** The prosecution has wide latitude to advance its strongest arguments and positions during closing argument, but must do so "within the boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts." *State v. Fears*, 86 Ohio St.3d 329, 332 (1999). "It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984).

### a. DNA Evidence

**{¶38}** Lett contends that the prosecutor made two critical misrepresentations of the forensic evidence. First, the prosecutor mischaracterized the probative value of the DNA evidence by telling the jury that, "It was his DNA that was found from the analysis of the interior of her – inside of her pants" and mischaracterized the probative value of the Y-STR evidence by misstating Schepeler's testimony as, "he went through and did that analysis and his report that it was in fact the defendant based on his opinion that the defendant was the major contributor." Second, the prosecutor mischaracterized Mansius's testimony that the source of the DNA sample from the crotch of the pants was semen from Dacoma.

**{¶39}** The DNA evidence Mansius testified about was inconclusive. There was insufficient DNA from all the samples, including the crotch of the pants, for Mansius to make any DNA conclusions. Mansius also testified that she could never testify that the source of DNA was from semen because DNA exists throughout the body. In sum, Mansius testified that she was unable to identify the source or identity of any of the DNA

of any of the samples other than the DNA that matched B.H.  Yet, the prosecutor stated that the DNA report identified that it was Dacoma Lett's DNA. In discussing the BCI reports, the prosecutor stated, "You received physical evidence in the form of BCI analysis reports that corroborated sexual conduct in that Dacoma Lett's DNA . . . it was his DNA that was found from - -  from the analysis of the interior of her  . . .  pants."

{¶40}  Schepeler testified that Y-STR is not unique to an individual but follows a paternal lineage. A grandfather, his sons, and his grandsons (who would be cousins of the same paternal lineage), etc. will all have the same general Y-STR. Schepeler also testified that he tested the Y-STR from the crotch of the pants and the major contributor was consistent with Dacoma Lett, but not exclusively his. When asked if Dacoma could be eliminated or identified with certainty, Schepeler testified "I can only say it is consistent with him." Schepeler also testified that he cannot determine where the Y-STR came from on the body or whether it came from a bodily fluid or a skin cell. However, the prosecutor told the jury that Scheper's testimony was "he went through and did that analysis and his report that it was in fact the defendant based on his opinion that the defendant was the major contributor."

{¶41} Finally, there was no testimony that any of the DNA samples were generated from semen. The testimony was the opposite. Yet the prosecutor informed the jury that Mansius testified and "she said one of the things that they do in that situation is the use of semen and because that has just a great amount of acid phosphate." Then the prosecutor compounded that mistake with a second mistake and informed that jury that "this in fact was the result of semen, DNA from Dacoma Lett that collected in the crotch area."

**{¶42}** "[B]oth the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970). However, here the prosecutor did not summarize the evidence or suggest reasonable inferences, but rather incorrectly described the two expert DNA witnesses' testimony and the BCI report results. In applying the prosecutorial misconduct test, we find that the prosecutor's statements about the DNA and Y-STR evidence were improper and misstated the evidence. It was unequivocal that the State did not present any evidence that Dacoma Lett's DNA or semen was identified in any of the test results. Neither of the expert witnesses identified Dacoma Lett as the source of the DNA, as the exclusive contributor of the Y-STR evidence, or as a source of semen. We find that Lett has met the first prong of the prosecutorial misconduct test, improper remarks. *See State v. Railey*, 2024-Ohio-5502, ¶ 27, ¶ 51-53 (1st Dist.) (court found prosecutor engaged in misrepresentations where prosecutor misstated the nature of the DNA and Y-STR evidence in closing argument); *State v. Howard,* 2023-Ohio-3870 (8th Dist.) (court found that prosecutor engaged in improper conduct by repeatedly referring to defendant's DNA and semen when there was no evidence of it); *State v. Metcalf*, 2012-Ohio-674, ¶ 7, ¶ 23-27 (12th Dist.) (court found that prosecutor mischaracterized DNA and Y-STR evidence repeatedly while questioning witnesses when there was no evidence that defendant was an exact match to the DNA sample).

### b. Counts in the Indictment

**{¶43}** Lett contends that the prosecutor also mischaracterized the charges during the closing statement in a manner that confused the jury and effectively altered the offenses charged in counts three and four, which resulted in a constructive amendment

to the indictment. The State argues that the prosecutor accurately stated the charges and even if she misstated them, it did not deprive Lett of due process.

**{¶44}** Crim. R. 7(D) provides in pertinent part:

The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged.

An appellate court reviews a trial court's decision to allow the amendment of an indictment for an abuse of discretion. *State v. Thornsey*, 2025-Ohio-5128, ¶ 26 (5th Dist.). An abuse of discretion implies a court's ruling is unreasonable, arbitrary, or unconscionable, and is more than a mere error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶45}** There was no amendment made under Crim.R, 7(D), rather Lett contends that there was a constructive amendment because the prosecutor's statements in closing effectively told the jury they could convict on all counts based on a finding of guilt on counts one or two rather than evaluating each charge independently.

**{¶46}** Lett was indicted on four counts: (1) count one was rape by force in violation of R.C. 2907.02(A)(2); (2) count two was rape by substantial impairment in violation of R.C. 2907.02(A)(1)(c); (3) count three was attempted rape by force; and (4) count four was attempted rape by substantial impairment. The prosecutor's remarks about the counts were as follows:

"The State charged the defendant, Dacoma Lett, with two counts of rape and two counts of attempted rape."

"As to count one of the indictment, the State charged the defendant and has proven that Dacoma . . . Lett engaged in sexual conduct with another

person, that being [B.H.], when the said Dacoma Lett purposely compelled the said other person [B. H.] to submit by force or threat of force."

"In count two, that count, once again, count two of rape, that Dacoma Lett engaged in sexual conduct with another person, [B.H.], who is not the spouse of the defendant, Dacoma Lett, and when the other person's ability to resist or consent was substantially impaired because of a physical condition and Dacoma Lett knew of had reasonable cause to believe that [B.H.'s] the other person's ability to resist or consent was substantially impaired because of this physical condition."

**{¶47}** These are accurate descriptions of the two rape counts in the indictment. After accurately describing count one the prosecutor tied the evidence presented at trial as follows:

As to count one . . . now you've heard testimony from [B.H.] that she was awakened on the couch that was located in Josh Peoples' apartment on West Water Street here in Chillicothe, Ohio, Ross County, Ohio with the defendant's penis in her vagina. . . . It's force for him to force himself upon her to do that. She clearly did not consent, as she told him to get off. . . .

As to count two . . . after awakening with the defendant's penis inside her, she told you earlier in her testimony how extremely intoxicated she had gotten that night. . . . They all knew how drunk she was. And as such, her ability to  - - to ability to resist at that point was - - was not there. . . . She was asleep on the couch waking up to this, waking up to find herself violated.

The State argues that the prosecutor urged the jury to find that a rape occurred on the couch by force or by impairment or both. We agree. The prosecution explained that both rape counts go to the activity on the couch.

**{¶48}** Next the prosecutor discussed the two attempted rape counts and recited the statutory elements of attempted rape. Then the prosecutor tied the evidence to the two attempted rape counts as follows:

Two counts of attempted rape and as the judge will charge you, and - - on - - on the law, the way it's charged in the indictment, count three does - - some - - co - - coincide with count one, an attempt of the rape charge in count one, which I'm going to refer to as the force count, the - - the rape

count, which is he did purp - - he had sexual conduct with another person, [B.H.], where - - whereas he purposely compelled [B.H.] to submit by force or threat of force, that being as he was on top of her and, she testified to, inside her at that point.

And with regard to - - with regard to count four of the indictment, Dacoma - - in which the state had charged that Dacoma M. Lett did purposely and with sufficient culpability for commission of a violation of 2907.02 of the Ohio Revised Code engage - - engage in conduct that, if successful, would constitute a result in a violation of 29 - - of section 2907.02 of the Ohio Revised Code. Again, that corresponding to count three of the indictment in which the State charged that he did purposely and with sufficient culpability for commission of violation 2907 - - oh, I'm sorry, that he did engage in sexual conduct with another person, that being [B.H.], was not a spouse of defendant, when the other person's ability to resist or consent was substantially impaired because of a physical condition and that he knew or had reasonable cause to believe that she - - her ability to resist or consent was substantially impaired because of that physical condition. Once again, ladies and gentlemen, you have heard - - you have heard testimony that after she escaped - - after she escaped the defendant in the living room from on the couch, she went into Josh's bedroom, then to the bathroom for another shower, because she felt so dirty and disgusted at what the defendant had just done to her. She then returned to Josh's bedroom again, laid down, cried herself back to sleep. She told you how she did this just to be awakened again, by the feeling of a per - - of the def - - of a penis on her butt. She then turned around, snatched the covers down and, once again, she saw Dacoma M. Lett. She told you how she then told him, it's nasty. They're cousins. Get off. Then, with - - and again, once again, with the attempt in count four, the substantial impairment of her physical condition due to her intoxication in both cases, as well as her being asleep at both points, once on the couch and then once on again on the bed.

**{¶49}** The State interprets this argument as an "attempted rape" occurred in the bedroom. We find the recitation confusing but interpret the prosecutor's statements about count three as an attempt to explain to the jury that count three is an attempted rape by force in the same manner, or with the same elements, that count one was a rape by force. Then the prosecutor discusses count four as an attempted rape by substantial impairment. The prosecutor then states that count four corresponds to count three: "Again, that corresponding to count three." After saying that the two attempted rape

counts correspond to each other, the prosecutor then ties the two attempted rapes to the behavior in the bedroom.

**{¶50}** Although we find the prosecutor's arguments connecting the counts to the evidence to be somewhat convoluted and challenging to parse, we find no misstatements of the indictment or of the counts set out in the indictments. The prosecutor did not add or introduce facts at trial that supported an essential element of a charge not specified in the indictment. We find no "constructive amendment" or other prosecutorial misstatements as it relates to the counts in the indictment.

### 3. Failure to Correct Testimony

**{¶51}** Lett contends that the prosecutor engaged in misconduct when she failed to correct material discrepancies in two instances of the witnesses' testimony, which created false impressions for the jury.

**{¶52}** "A prosecutor has a duty to ensure that a criminal defendant receives a fair trial, which includes obligations to refrain from knowingly using perjured testimony and to correct testimony known to be false." *State ex rel. Sands v. Coulson*, 2021-Ohio-671, ¶ 8. To prevail on this claim, Lett must show that a witness's statement was false, that it was material, and that the prosecutor knew it was false. The right to due process is violated only when there is a reasonable likelihood that the false testimony could affect the judgment of the jury. *State v. Nicholson*, 2024-Ohio-604, ¶ 272.

> In *Napue* v. *Illinois*, this Court held that a conviction knowingly "obtained through use of false evidence" violates the Fourteenth Amendment's Due Process Clause. To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it "to go uncorrected when it appear[ed]." If the defendant makes that showing, a new trial is warranted so long as the false testimony "may have had an effect on the outcome of the trial,"—that is, if it " 'in any reasonable likelihood [could] have affected the judgment of the jury,' " In

effect, this materiality standard requires " ' "the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' "

(Citations omitted, brackets in original) *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025).

**{¶53}** Lett contends that B.H. testified that she did not wash during her second shower but gave two different reasons for not washing. B.H.'s testimony at the first trial was that she got "into the shower physically, but I didn't like wash up." When she was asked if the water ran over her, B.H. responded, "I had water coming down, but it wasn't like - - like the water pressure in his house wasn't very strong, so it wasn't like a strong powerful water. Like it was just very - - like I barely turned it on." However, at the second trial, B.H. testified that she didn't wash in the shower because, "as I was standing there, I was like, I am going to rinse away anything if I go to the police, like there's going to be nothing there to prove my point. So, I got out the [sic] shower, I didn't wash up with soap or nothing, I just got out."

**{¶54}** The State argues that the statement is not false and that it was consistent with the statement she gave to law enforcement during an interview. A police report stated that when law enforcement asked B.H. if she washed her vaginal area, she responded that she did not because she started thinking of a rape kit and did not want to wash away evidence. The State concedes that that police report was not introduced into evidence and is not in the record, but that it was provided to Lett during discovery and shows that the prosecutor did not believe that the testimony was false.

**{¶55}** We find that Lett has failed to establish that B.H.'s statement was false. At most, B.H.'s testimony could be characterized as having a discrepancy. There could have been multiple reasons that B.H. did not wash during her second shower and the State

argues that the fact that water pressure was low gave B.H. additional time to consider whether it would be prudent to wash and possibly destroy evidence. " 'The burden is on the defendants to show the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses does not establish knowing use of false testimony.' " *State v. Bender-Adams*, 2025-Ohio-1364, ¶ 19 (8th Dist.), quoting *Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1998).

**{¶56}** Additionally, we find that Lett's counsel procured this same testimony from B.H. on cross examination and did nothing to attempt impeachment of it:

> Q: And then you [went] back into the bathroom?
> A: Yes, M'am.
> Q: Did you turn the water on or did you just stand in the shower?
> A: I turned the water on.
> Q: But you did not use any soap or anything?
> A: No, M'am.
> Q: Were you still feeling intoxicated at that point?
> A: Yes, but I was just trying to get out, because I was hot and I didn't want to run any water down there and, like, have the possibility of, like washing everything away.

Therefore, even if we assumed that the discrepancies in B.H.'s testimony could be characterized as false, we cannot find that there was a reasonable likelihood that the prosecutor's questioning affected the trial outcome when Lett's own cross-examination of B.H. elicited the same testimony.

**{¶57}** Lett also contends that the prosecutor failed to correct misleading testimony from Detective Demint. He argues that Detective Demint gave the jury the false impression that Lett did not deny having sex with B.H., he only denied that B.H. took a shower in his presence and that "if this would have happened, somebody else would have heard or known." However, during the first trial, Detective Demint testified that Lett offered

to take a polygraph. Thus, Lett argues, Detective Demint's testimony conveyed to the jury that he acquiesced in the allegations against him and did not assert his innocence.

**{¶58}** Again, Lett failed to establish anything false about Detective Demint's testimony. During the first trial, he was asked by Lett's counsel on cross-examination whether Lett offered to take additional tests and Detective Demint testified that Lett offered to take a polygraph test. However, on redirect in the first trial, Detective Demint testified that while Lett offered to take a polygraph test, he did not follow through with it: "he would not return my phone calls after that interview."

**{¶59}** We find that Detective Demint's failure to testify about Lett's offer to take a polygraph test in the second trial was not misleading or false, but rather was because Lett's counsel did not ask about it on cross-examination during the second trial. This was likely sound trial strategy, particularly where the State could readily establish that when offered the test, Lett did not follow up. Lett has failed to establish that the testimony was false or misleading.

### 4. Prejudice from Prosecutorial Misconduct

**{¶60}** Because we find that the prosecutor's statements during closing argument about the DNA and Y-STR expert witnesses' testimony and reports were improper and misstated the evidence, we must determine whether Lett has established plain error – that the outcome of the trial would have been different had the prosecutor accurately described the DNA and Y-STR evidence. "[I]t is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks. Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's

comments, the jury would have found defendant guilty." *State v. Smith*, 14 Ohio St.3d 13, 15 (1984).

**{¶61}** This case differs significantly from *Railey, Metcalf* and *Howard*, *supra*, where courts ultimately found that prosecutorial mischaracterization of DNA and Y-STR evidence did not affect the outcome at trial because the State's remaining evidence against the defendants in each case was overwhelming.

**{¶62}** In *Railey*, the child victim fled the house shortly after she was sexually assaulted by Railey and ran across a parking lot to an aunt's house, banged on the door hysterically, and told her aunt what had happened. Both the child's mother and the aunt reported the assault immediately to law enforcement. The child and aunt testified at trial and the child's mother's remarks (the mother was deceased by the time of trial) were played for the jury. A swab from the child's vagina contained Y-STR profile consistent with Railey. The defense did not dispute the characterization that Railey's DNA was found on the child's vagina but argued that it was due to a secondary transfer. *State v. Railey*, 2024-Ohio-5502, ¶ 24, 27 (1st Dist.).

**{¶63}** In *Metcalf*, Metcalf told law enforcement that the 15-year-old victim "set him up" and that he awoke unexpectedly to find his pants inexplicably down, the victim's menstrual blood on his penis, and the victim standing next to him wiping herself with a t-shirt. Metcalf informed the detective, "I think that [the victim] might have had sex with me while I was asleep." Swabs tested found a Y-STR profile consistent with Metcalf on the victim's menstrual pad. *State v. Metcalf,* 2012-Ohio-674, ¶ 6-7 (12th Dist.).

**{¶64}** In *Howard*, Howard testified that he had consensual sex with the victim and that the victim was lying about it being nonconsensual. However, a recorded phone call

that was made at the police's directive between the victim and Howard was played for the jury. In it, Howard apologized to the victim and asked her to come over to talk about what happened. Howard stated, "I got confused and thought you were somebody different" and explained that he thought she was another woman that he had been dating. The victim told Howard that he raped her and she went into detail about the impact the incident had on her. Howard responded, "You know I would never . . . want to hurt you. I don't have anything I can do to explain or excuse myself." *State v. Howard*, 2023-Ohio-3870, ¶ 23 (8th Dist.).

{¶65} In this case, the remaining evidence does not rise to the level of "overwhelming proof" of Dacoma Lett's guilt. *State v. Harris*, 2012-Ohio-2973, ¶ 23 (9th Dist.). We have the testimony from B.H., but also the testimony of two other witnesses who were present in the small box apartment throughout the evening. Fredrick Lett was in the recliner next to the couch and testified that he was awake during both of B.H.'s showers. He testified that Dacoma Lett left and was not present in the apartment during either of the two showers. If believed, this would mean that Dacoma Lett would not have been present in the apartment when B.H. testified about the incident on the couch.

{¶66} Both Fredrick Lett and Josh Peoples testified that they were in the apartment throughout the night and did not see or hear any interaction between Dacoma and B.H. Josh Peoples testified that B.H. texted him around 5:00 a.m. to come to bed. Peoples testified that Dacoma Lett left at approximately 5:30 a.m. Fredrick Lett testified that Dacoma called him to get back into the apartment and that Dacoma was facetiming someone when he and Peoples left to run errands and was still on the phone when they returned. They were absent from the apartment for two 15-minute errands, but both

testified that neither Dacoma nor B.H. acted odd. B.H. did not appear upset, she ate a cheeseburger, asked for a blunt wrap, and then left when a friend came saying, "All right, y'all. I'll see y'all later." The State did not introduce any evidence of cellphone calls, texts, or ping location data to lend support to the State's version of the timeline of events or to pin down when Dacoma Lett may have been present in the apartment.

{¶67} No search warrant was executed for the apartment and B.H.'s underwear was never located or swabbed. Josh Peoples, the witness who owned the apartment and spent the night in the same bed as B.H., was not interviewed by law enforcement until two years after the incident. The State did not place into evidence any video recording of the police interview of Dacoma Lett. Rather law enforcement testified from memory about an interview with Dacoma Lett that occurred over two and a half years earlier. A Y-STR profile consistent with Dacoma Lett, Dacoma's father, brother and his paternal male cousins, all who were common visitors to the apartment, was found on the crotch of B.H.'s leggings. But B.H. testified that she had been in contact with the futon, couch, and bed at various times through the evening both naked and while wearing the leggings. Incidental transfer of Y-STR was a more plausible explanation here than in *Railey* (vaginal swab of child) and *Metcalf* (swab of victim's menstrual pad).

{¶68} It came down to a "they said, she said" as to whether Dacoma Lett was even present in the apartment for one of the two incidents. Witness credibility was a key factor. B.H. testified that she ingested marijuana both days (prior to and following the incident) and consumed exceptionally large quantities of alcohol throughout the evening and well into the early morning hours. Given the amount of alcohol and drugs consumed by her throughout the evening, it would not be unreasonable for a jury to question the accuracy

of B.H.'s memory and her perception of reality and be reluctant to afford her testimony the degree of weight required for a criminal conviction, making the prosecutor's misrepresentation of the DNA evidence particularly troublesome. We find that the prosecutor's incorrect statement that Dacoma's semen and his DNA were found in the crotch of B.H.'s pants and the prosecutor's erroneous recitation of the two expert witnesses' testimony unfairly and prejudicially bolstered the weight of the State's evidence. *See State v. Harris*, 2012-Ohio-2973, ¶ 17-23 (9th Dist.) (after extensive review of evidence supporting the State's rape charges, appellate court determined that it could not say beyond a reasonable doubt that the jury would have found defendant guilty had there been no misconduct on the part of the prosecutor).

**{¶69}** Sometimes concerns about prosecutorial misstatements during closing arguments are eased by the legal maxim that the jury is instructed that closing arguments are not evidence. *State v. Smith,* 2024-Ohio-5168, ¶ 128 (4th Dist.). Here that fails to alleviate our concerns. *State v. Smith,* 14 Ohio St.3d 13, 15 (1984) (in cases of blatant misstatements on the part of the prosecution, the general instruction that arguments of counsel are not to be considered as evidence was insufficient to correct the error); *State v. Harris,* 2012-Ohio-2973, ¶ 16 (9th Dist.) (prosecutor's misconduct could not be remedied by the instruction that closing arguments are not evidence). Here, the jury interrupted deliberations to directly ask about the meaning of the Y-STR profile results. During their deliberations, the jury submitted a question, "concerning exhibit six and seven" which were the two Y-STR DNA profile reports. The jury asked, "Can it be said that the two Y-STR DNA profile samples that were specifically analyzed show that Dacoma M. Lett DNA alone was the major contributor of the sample?" The trial court

responded by telling the jury that they would have to rely upon their recollection of the evidence. The jury then interrupted their deliberations a second time to inform the trial court that they had reached an impasse and were unable to reach a unanimous verdict. The trial court gave them further standard instructions concerning the impasse. We find that the jury's question about how to interpret the DNA evidence and their subsequent impasse shows that the jury's recollection of the DNA and Y-STR testimony was tainted by the prosecutor's incorrect recitation of it during closing argument. As a result, we find that the prosecutor engaged in misconduct that substantially undermined the fairness of the trial and affected the outcome.

{¶70} We sustain Lett's first assignment of error. Because prosecutorial misconduct deprived Lett of a fair trial, we reverse the judgment of the trial court and remand for a new trial on the matter. *State v. Beebe*, 2007-Ohio-3746, ¶ 1 (4th Dist.); *State v. Sage,* 31 Ohio St.3d 173, 174 (1987) ("Double jeopardy principles do not bar retrial where an appellate court reverses a conviction based upon prosecutorial misconduct when such conduct was not calculated to goad the defense into seeking a mistrial.").

### B. Manifest Weight of the Evidence

{¶71} Because we sustain Lett's first assignment of error and remand for a new trial, his second assignment of error challenging the manifest weight of the evidence is moot. App.R. 12(A)(1)(c). An analysis of the manifest weight of the evidence is not necessary because even if we were to sustain his second assignment of error, his relief would be the same as it is for sustaining his first assignment of error – a new trial. *State v. Thompkins*, 78 Ohio St. 3d 380, 387 (1997). However, a retrial is barred if the reversal

was based upon a finding that the evidence was legally insufficient to support the conviction. *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 47 (1982). Therefore, we will review Lett's third assignment of error which challenges the sufficiency of the evidence on counts one, three, and four.

### C. Sufficiency of the Evidence

**{¶72}** For his final assignment of error, Lett contends that there was insufficient evidence to support his convictions on counts one, three, and four. Specifically, he argues that the State failed to present sufficient evidence of force and substantial impairment to sustain the convictions on those counts.

**{¶73}** The State argues that because Lett does not contest the sufficiency of the evidence as to the rape by impairment in count two, and the trial court merged count one and two, even if there were not sufficient evidence of force to sustain count one, the consequences would be that Lett would be sentenced on count two, which he does not contest. Additionally, the State contends there was sufficient evidence of force because B.H. testified that after she woke up she told Lett to stop and he would not stop.

**{¶74}** When counts in an indictment are merged for the purposes of sentencing, the reviewing court need not consider the sufficiency or the weight of the evidence of the merged counts because any error relating to those counts would be harmless. *E.g., State v. Underwood,* 2024-Ohio-2273, ¶ 56 (4th Dist.). Lett is contesting counts one, three, and four. The trial court merged counts one and two and sentenced Lett on count one and merged counts three and four and sentenced Lett on count three. Therefore, we will review only counts one and three for sufficiency and disregard Lett's argument as to count four.

### 1. Standard of Review

**{¶75}** "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Maxwell*, 2014-Ohio-1019, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, (1991), paragraph two of the syllabus; following *Jackson v. Virginia*, 443 U.S. 307 (1979).

**{¶76}** An appellate court must construe the evidence in a "light most favorable to the prosecution." *State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Grant*, 67 Ohio St.3d 465, 477 (1993). Further, "[t]he court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Dillard*, 2014-Ohio-4974, ¶ 22 (4th Dist.), citing *State v. Kirkland*, 2014-Ohio-1966, ¶ 132; *State v. Lodwick*, 2018-Ohio-3710, ¶ 9 (4th Dist.). Thus, "a reviewing court is not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.' " *State v. Davis*, 2013-Ohio-1504, ¶ 12 (4th Dist.), quoting *State v. Thompkins,*78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring). Rather, a reviewing court will not overturn a conviction on a sufficiency of the evidence claim unless reasonable minds could not reach the conclusion that the trier of fact did. *State v. Tibbetts*, 92 Ohio St.3d 146, 162, (2001); *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001); *State v. Torres*, 2023-Ohio-1406, ¶ 44-45 (4th Dist.).

### 2. Elements of Rape and Attempted Rape

**{¶77}** Lett challenges the sufficiency of the evidence to support his convictions on count one, which is one count of rape by force or threat of force in violation of R.C.

2907.02(A)(2) and count three, which is one count of attempted rape by force in violation

of R.C. 2923.02 and R.C. 2907.02(A)(2) (attempted rape by force).[1] The elements of the

count one rape offense are:

> R.C. 2907.02(A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

 The elements of the count three attempted rape are:

> R.C. 2923.02 (A) No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.

> R.C. 2907.02(A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

**{¶78}** The rape offense under R.C. 2907.02(A)(2) requires the State to prove that

a victim submitted "by force or threat of force." "Force" means any violence, compulsion,

or constraint physically exerted by any means upon or against a person or thing. R.C.

2901.01(A)(1). " '[S]ome amount of force must be proven beyond that force inherent in

the crime itself.' " *State v. Dye*, 82 Ohio St.3d 323, 327 (1998). However, "[a]ny amount

of physical force or threat, however slight, is sufficient to support * * *" a rape conviction

under R.C. 2907.02(A)(2). *State v. Heiney,* 2018-Ohio-3408 ¶ 122 (6th Dist.); *State v.*

*Torres*, 2023-Ohio-1406, ¶ 47 (4th Dist.).

**{¶79}** Lett contends that there was insufficient evidence of force to affirm his

conviction for rape by force on count one. Lett argues that the prosecutor's theory of force

was articulated in closing argument and was that the incident on the couch was a rape

---

[1] Lett was indicted on December 16, 2022 for offenses occurring on February 27, 2022 so we use the statutory provisions in effect at that time.

by force.  We find that the prosecutor's closing argument articulated that the incident on the couch was both that Lett committed rape by force and by substantial impairment. The evidence of the incident on the couch as testified to by B.H. was that she was "passed out on the couch," naked, and "woke up," "opened my eyes and Dacoma Lett was like right here in front of my face. And he was already penetrating me." There was sufficient evidence from multiple witnesses that B.H. was extremely intoxicated and everyone in the apartment was aware of it and Lett does not contest the rape conviction under R.C. 2907.02(A)(1)(c). However, B.H. testified that after she awoke and discovered the rape was occurring, she told Dacoma to stop, and he would not stop. "He was raping me. He was already penetrated inside of me. And I told him to get off of me and he wouldn't stop." Therefore, what started as a rape by substantial impairment, continued into a rape by force when B.H. gained consciousness and told Dacoma to stop and he did not stop. This fact distinguishes this case from *State v. Torres,* 2023-Ohio-1406, ¶ 59 (4th Dist.), in which the defendant initially penetrated the victim while she slept and then immediately ceased the penetration when the victim awoke.

{¶80}  Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law. *State v. Wilson,* 2007-Ohio-2202, ¶ 25. Here we find, after viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence of force when B.H. told Lett to stop and he would not stop.

{¶81} Next Lett challenges the sufficiency of the evidence on count three, attempted rape by force related to the incident in the bedroom. Lett argues that there was insufficient evidence of force because B.H.'s testimony did not mention attempted force

or threat of force. The State argues that there was evidence of force because after B.H. awoke and got away, Dacoma verbally commanded her to "come here" several times.

**{¶82}** B.H. testified about the bedroom incident as follows:

Q. Okay. So, what happened next?

A. I just fell asleep after awhile, laying there and I woke up again. I couldn't see his face at first, because he had a cover over his face, so I pulled the cover down because I felt something touching my butt, him trying to get back in from behind, and it was Dacoma Lett, again.

Q. Okay, when you say him trying to get back in from behind, what do you mean?

A. He was trying to penetrate me from behind.

Q. With what?

A. His penis.

Q. All right. Now where you - - were you still drunk?

A. No, not at that point.

Q. So, You - - but you remained there. You couldn't leave?

A. No, at that point, I got up and I was angry, cause I was like, what are you doing, like get away from me. And he just kept telling me to come here. Come here. Like it was normal. And I'm telling him like, no, what are you doing? Like, no, we are the same blood. No. And I got up and tried to call for help. I went and found my phone and a charger. Plugged it up in the bedroom and I called my friend to come get me.

**{¶83}** When reviewing the evidence for sufficiency, we must do so in a light most favorable to the prosecution. We cannot glean from the transcript the tone or manner in which B.H. conveyed Dacoma's repeated verbal commands to "come here," but when viewed in a light most favorable to the prosecution, we find that these repeated commands to "come here" constituted verbal threats intended to instill fear or duress and compel B.H. to comply. Again, this is another aspect of this case that distinguishes it from *Torres,*

*supra,* in which we found that the defendant in *Torres,* "did not tell K.S. to do anything or refrain from doing anything, and did not threaten her in any way if she failed to comply." *State v. Torres*, 2023-Ohio-1406, ¶ 60 (4th Dist.). Under these circumstances, Lett's repeated commands to "come here" were a threat of force sufficient as a matter of law to support a conviction on attempted rape by force under count three. *See D.D. v. B.B.*, 2022-Ohio-1032, ¶ 23 (10th Dist.) (aggressive verbal statements constituted a threat of force).

**{¶84}** We reject Lett's contention that his convictions on counts one and three were not supported by sufficient evidence. After viewing the evidence in a light most favorable to the prosecution, we conclude that the evidence is legally sufficient to support those verdicts as a matter of law.

**{¶85}**   Accordingly, we overrule the third assignment of error.

## IV. CONCLUSION

**{¶86}** We sustain the first assignment of error, find the second assignment of error moot, and overrule the third assignment of error. We reverse the trial court's judgment and remand for a new trial.

JUDGMENT REVERSED, CAUSE REMANDED FOR NEW TRIAL.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS REVERSED, CAUSE REMANDED FOR NEW TRIAL and that appellee shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
       Michael D. Hess, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**